IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JASON N. WITMER,                )
                                )
              Petitioner,       )           4:03cv3315
                                )
       vs.                      )      MEMORANDUM AND ORDER
                                )
ROBERT HOUSTON,                 )
                                )
              Respondent.       )

This matter is before the court for decision on the Petition for Writ of Habeas Corpus, as amended ("§ 2254 petition"), filed pursuant to 28 U.S.C. § 2254 by Jason N. Witmer, a prisoner in the custody of the Nebraska Department of Correctional Services. As a result of my previous orders, all five of the habeas corpus claims raised in the petitioner's Third Amended Petition are before the court for decision at this time.   On March 16, 2000, the District Court of Lancaster County, Nebraska, sentenced the petitioner upon his previous plea of no contest to charges of attempted robbery and use of a weapon to commit a felony.  Thereafter, the Nebraska Court of Appeals affirmed the petitioner's conviction, and the Nebraska Supreme Court denied further review.

### § 2254 Claims

The petitioner raises the following § 2254 claims in his Third Amended Petition (filing no. 39), which, pursuant to my Memorandum and Order of February 12, 2006 (filing no. 58), constitutes the operative § 2254 petition in this case:

> 1.    The petitioner received ineffective assistance of counsel, as trial counsel failed to investigate, challenge confession and blood evidence, inform the petitioner of his accuser's change of testimony in a plea proffer, make appropriate objections at sentencing, and raise issues on appeal.

> 2.    The petitioner's plea of no contest was not knowingly, intelligently and voluntarily made and should not have been accepted by the trial court.

> 3.    The petitioner received an "untenable sentence," which violated his right to due process, created a miscarriage of justice and constituted plain error.

1

4.     The petitioner's plea, conviction and sentence were all based on false accusations by the sole witness and accuser against the petitioner; that witness (Kenneth Barnes) later admitted that his accusations against the petitioner were false; and Barnes has explained that he had been deceived and intimidated into making the false accusations.  By relying on Barnes' original accusations without mention of Barnes' subsequent statements, the State used fraudulent and improper means to obtain the petitioner's plea and caused "manifest injustice."

5.     The petitioner's trial counsel had a conflict of interest.

## Exhaustion

The foregoing claims have been presented to the Nebraska appellate courts, and those claims have by now been exhausted for purposes of 28 U.S.C. § 2254(b).  See, e.g., Case No. A-00-393, the petitioner's direct appeal from his conviction and sentence; Case No. A-02-338, the petitioner's appeal from the denial of his first motion for postconviction relief; Case No. A-04-24, the petitioner's appeal from the denial of his motion to withdraw no contest plea; and Case No. A-04-905, the petitioner's appeal from the denial of his second motion for postconviction relief.

On March 21, 2002, the district court denied the petitioner's first postconviction motion, without an evidentiary hearing.  The Nebraska Court of Appeals affirmed the district court in a Memorandum Opinion and Judgment issued on July 18, 2003 (Case No. A-02-338).

On August 9, 2002, while his first postconviction appeal was pending, the petitioner filed a motion in the district court to withdraw his no contest plea and for a new trial.  The district court denied the motion in the belief that the court had been divested of jurisdiction by the pending postconviction appeal.  However, on appeal in Case No. A-02-944, the appellate court remanded the petitioner's motion to the district court, where the court ultimately heard the motion to withdraw no contest plea and denied it on December 2, 2003.  The Nebraska Court of Appeals affirmed the denial of the petitioner's motion to withdraw plea on July 19, 2004 (Case No. A-04-24).

The petitioner then filed a second postconviction action.  The district court denied that motion, also, and the Court of Appeals affirmed the denial on appeal (Case No. A-04-905).  The Nebraska Supreme Court denied further review in Case Nos. A-00-393, A-02-

2

338, A-04-24 and A-04-905.[1]

## Background

In the early morning hours of August 16, 1999, four men broke into an apartment inhabited by Carole Gutzmer on Wedgewood Drive in Lincoln, Nebraska. They rifled through her property, held her captive and forced her to accompany them when they broke into the apartment across the hall, inhabited by Robert Jacobs and Gail Clifton. As the men entered the second apartment, Jacobs saw that one held a gun. Jacobs, armed with his own .22 caliber gun, shot one of the men. The intruders then fled. Minutes later, the petitioner appeared at a hospital emergency room bleeding from gunshot wounds.

Later during the morning of August 16, 1999, Lincoln police detained Kenneth Barnes and questioned him in connection with the incident. Eventually Barnes made statements, memorialized in a police report, in which Barnes accused the petitioner of instigating the robbery, i.e., acting as the mastermind and leading an armed group to rob the victims of 10 pounds of marijuana.

Meanwhile, according to the petitioner, despite his emergency surgery on August 16, 1999, after checking himself into the hospital with multiple gunshot wounds, Lincoln police officers questioned him in the hospital about the robbery, held him incommunicado, and obtained inculpatory statements from him placing him at the scene of the robbery. The police also obtained blood evidence linking the petitioner to a stolen car. The officers extracted the blood evidence and statements while the petitioner was hospitalized, medicated, recovering from surgery and under the influence of morphine.

Two months later, on October 25, 1999, Barnes made a different statement, taped in connection with a plea proffer made to the prosecutor in Barnes' criminal proceedings (the "proffer statement") (see Exh. 31 to BOE of 3/19/04 hrg in petitioner's 2d postconviction action; Ct. Rep'r Cert. 9/1/04). Barnes' proffer statement changed some of

---

[1]Two appeals by the petitioner have no substantive bearing on the decision in this case: Case No. A-02-944, in which the Nebraska Court of Appeals remanded the petitioner's motion to withdraw no contest plea and for a new trial to the district court, and Case No. A-03-267, a postconviction appeal which the petitioner voluntarily dismissed as moot.

the contents of his original police report.  In the proffer, Barnes accused another individual, Woody Shackelford, of initiating the events of August 16, 1999.  Shackelford had arranged to pick up some money, and that is why the group went to the apartment house where the incident occurred.  Marijuana was not involved. Shackelford had a specific person and place in mind, but the others did not know the person or the location.  Barnes, driving his girlfriend's vehicle with the petitioner in the passenger's seat and Shackelford in the back, arrived at the apartments directed by Shackelford.  According to the proffer, before they entered the building, the petitioner questioned Shackelford somewhat more closely, and Shackelford made a threatening remark about the person who owed him the money, i.e.: "well if he don't pay me I'm gonna make him pay me ...."  Nevertheless, no one withdrew from the undertaking.  The others then advanced upstairs, while Barnes parked the vehicle.

According to his proffer, when Barnes arrived inside the building, he heard yelling and loud swearing.  Someone, Barnes did not know who, had kicked in the first door. Shackelford then ran across the hall, pounded on the door, yelling for "Bob," and kicked the door in.  Shackelford made Carole Gutzmer lie on the floor.  There was some milling about, and Barnes soon heard gunshots.  He dropped to the floor, and saw the petitioner try to run.  The petitioner had been shot.[2]  All of the home invaders sprinted out the door. Barnes then took the wounded petitioner to the hospital and, at the petitioner's request, dropped him off on the corner because of a police cruiser next to the hospital entry.

However, the petitioner did not learn about Barnes' proffer statement until after he had entered his plea of no contest on February 10, 2000.  Just prior to his March 16, 2000 sentencing, the petitioner received a transcript of Barnes' proffer statement from J'Twan

---

[2]Later in the proffer, Barnes explains that the petitioner was shot when he moved to the back of the second apartment and turned on the light in the bedroom.  When the light went on, the shooting started.  According to the proffer, although the resident of the second apartment, Bob Jacobs, stated that he shot a person who was pointing a gun at him, Barnes saw only one firearm, which was in the possession of Shackelford.

Although Barnes' proffer, unlike his earlier police report, does not include J'Twan Overstreet among the perpetrators, Overstreet entered pleas of no contest in October of 2000, in the District Court of Lancaster County, Nebraska, to two counts of attempted robbery arising out of the incident.

Overstreet, who had been released on bond.

In the petitioner's view, the State (aware of Barnes' proffer but without disclosing it) knowingly used false and misleading information as the factual basis for the petitioner's plea.  By relying on Barnes' original police report without mention of Barnes' subsequent proffer statement, the State used fraudulent and improper means to obtain the petitioner's plea and caused manifest injustice, according to the petitioner.

The petitioner also complains that he did not receive Barnes' proffer statement from his own attorney.  Furthermore, his trial attorney failed to inform the sentencing judge of Barnes' proffer statement and allowed the petitioner's sentencing to proceed without that information, as did the prosecutor.  While the petitioner concedes that he mentioned the proffer at his sentencing hearing, he contends that the judge should have stopped the sentencing proceeding and should have declined to sentence the petitioner until exploring the proffer.

The petitioner emphasizes that the prosecution's theory of the case originated with Barnes' accusations, as memorialized in Barnes' police report, to the effect that the petitioner had led the group to the victims' apartments in order to steal 10 pounds of marijuana, that the petitioner brandished a gun, and that the petitioner acted as the "moving force" primarily responsible for the criminal acts.  Yet Barnes changed his story in his proffer statement, and the proffer, even if it "may not have contained the full truth, which it didn't; ... it contained a lot less lies and discrepancies and was far more consistent with the evidence than Barnes' original statement of accusations which the State continued to embrace and use in all proceedings, including its factual basis" [in the petitioner's plea proceeding].  (BOE of 8/15/03 telephone hearing on petitioner's Motions to Withdraw No Contest Plea and For New Trial, Vol. I at 20, Ct. Rep'r Cert.1/29/04.)

Later, while confined at the same prison as the petitioner, Barnes executed two affidavits dated August 5, 2002 and July 29, 2003 (Exhs. 24 & 25 to BOE of 3/19/04 hrg in 2d postconviction action; Ct. Rep'r Cert. 9/1/04).  In those affidavits, Barnes explained that he gave his original statement (police report) because he had been led to believe that the petitioner, then in the hospital, was making charges against him, and so Barnes retaliated by making false accusations against the petitioner. Instead, according to the

5

affidavits, Barnes never saw the petitioner with a weapon; the petitioner never planned any robbery; Woody Shackelford committed the criminal acts; and insofar as Barnes' previous police report and proffer statement incriminated the petitioner, those statements were untrue and coerced.[3]

The petitioner reasons that a plea, conviction or sentence obtained through false accusations constitutes a manifest injustice. All other evidence against him, according to the petitioner, was merely circumstantial. Barnes, the sole eyewitness and only person to accuse the petitioner, subsequently admitted that his accusations against the petitioner were false, and Barnes alleged that he had been deceived and intimidated into making the false accusations.

The petitioner states that the import of Barnes' proffer is not so much that it contained the full truth of what happened on August 16, 1999, but that it undermined the truth of the account Barnes had previously given of the robbery in his police report. Barnes' proffer and subsequent affidavits were statements against Barnes' own interest, and yet they discredited the State's factual basis for the petitioner's plea. However, the petitioner's plea, conviction and sentence were all based on Barnes' false police report. The petitioner does not deny his presence at the scene of the crime. He states instead that he believes he is entitled to start anew with a fair trial or a new plea based on a *true* account of the events of August 16, 1999.

### Standard of Review

As for the merits of the petitioner's claims, the Eighth Circuit Court of Appeals, in Niederstadt v. Nixon, 465 F.3d 843 (8th Cir. 2006), clarified that it is not always possible to determine whether a claim has been "adjudicated on the merits" within the meaning of 28 U.S.C. § 2254(d). 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective

---

[3]The petitioner cites Barnes' affidavits for the proposition that Barnes believed the petitioner, while in the hospital, was attempting to blame the incident on Barnes. The petitioner argues that Barnes was coerced and intimidated into giving his original police report because the police misinformed the petitioner's girlfriend that Witmer, while in the hospital, was in the process of incriminating Barnes. The girlfriend then conveyed that misinformation to Barnes by telephone just before the police arrested Barnes in the course of a traffic stop.

Death Penalty Act of 1996 ("AEDPA"), directs this court to apply a deferential standard of review to decisions "adjudicated on the merits in State court proceedings."  Section 2254(d) states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Within the meaning of 28 U.S.C. § 2254(d)(1), "[a] state-court decision is contrary to [the Supreme Court's] clearly established precedents if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005).  Similarly, "[a] state-court decision involves an unreasonable application of ... clearly established precedents if the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner."  Id.

28 U.S.C. § 2254(d)(2) must be read together with 28 U.S.C. § 2254(e)(1), which states:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

As explained by the Supreme Court, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. 322,

7

324 (2003).

The petitioner's first and second claims in this case were adjudicated on the merits by the Nebraska appellate courts.  See State v. Witmer, No. A-02-338, slip op. (Neb. App. July 18, 2003), *review overruled (Neb. Aug. 27, 2003)*, on appeal from the denial of the petitioner's first motion for postconviction relief.  Thus, the issue in this court as to the petitioner's first and second claims is only whether the Nebraska courts, in adjudicating the merits of those claims, (1) produced a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) based their decisions on an unreasonable factual determination in light of the record.

On the other hand, the Nebraska appellate courts summarily affirmed the denial of the petitioner's second motion for postconviction relief, without expressing an opinion as to the merits of the petitioner's third, fourth and fifth claims.  When this court reaches federal constitutional claims which were not adjudicated on the merits by the state appellate courts, the deferential standards of 28 U.S.C. § 2254(d) do not apply, and, in that situation, the federal habeas court conducts a de novo review of the claims.  Niederstadt v. Nixon, 465 F.3d 843 (8th Cir. 2006), *citing* Pfau v. Ault, 409 F.3d 933, 938-39 (8th Cir. 2005).[4]

---

[4]See also Brown v. Luebbers, 371 F.3d 458, 460-61 (8th Cir. 2004) (*en banc*):  "[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court .... So the first question for us to consider is:  what constitutes an adjudication on the merits? From the plain language of the statute and black-letter law, we know that the state court's decision must be a judgment-an adjudication-on a substantive issue-the merits (as compared with a procedural or technical point).  A survey of opinions from our sister circuits demonstrates that, beyond these two considerations, resolving the question is not so easy. One thing is clear-no court has established bright-line rules about how much a state court must say or the language it must use to compel a § 2254 court's conclusion that the state court has adjudicated a claim on the merits. That is as it should be, given one court's difficulty in divining the thought processes of another based only on language being used in certain ways, not to mention the comity issues that would be raised .... We must simply look at what a state court has said, case by case, and determine whether the federal constitutional claim was considered and rejected by that court."

**Applicable Law**

The "first step, then, in evaluating a challenge to the state court's application of the law is to determine what, if anything, the Supreme Court has said on the subject. From there, we proceed to take a careful look at the decision of the state court." Kinder v. Bowersox, 272 F.3d 532,537-38 (8th Cir. 2001), citing Williams v. Taylor, 529 U.S. 362, 405 (2000).

**Plea**

Originally charged with a seven-count Information charging robbery, burglary, kidnapping, attempted robbery, use of a deadly weapon to commit a felony, a second burglary, and a second use of a deadly weapon to commit a felony (see BOE of Arraignment on 10/13/99; Ct. Rep'r Cert. 4/24/00), the petitioner, pursuant to a plea bargain, entered a plea of no contest to an Amended Information charging two counts of attempted robbery and one count of use of a weapon to commit a felony (see BOE of Plea hearing on 2/10/00; Ct. Rep'r Cert. 4/24/00). The maximum penalty for the original charges would have aggregated 260 years in prison. Approximately one month after the petitioner entered his plea, he received a prison sentence of 35-50 years, within the statutory limits for the offenses of conviction.

"It is beyond dispute that a guilty plea must be both knowing and voluntary .... 'The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Parke v. Raley, 506 U.S. 20, 28-29 (1992). While "the governing standard as to whether a plea of guilty is voluntary for purposes of the Federal Constitution is a question of federal law ... and not a question of fact subject to the requirements of 28 U.S.C. § 2254(d)," the historical facts underlying such pleas are entitled to deference under § 2254(d). Oyague v. Artuz, 393 F.3d 99, 104 (2d Cir. 2004), quoting Marshall v. Lonberger, 459 U.S. 422, 431 (1983).

At the plea hearing, before accepting the petitioner's no contest plea, the district court explained the details of the proceedings. The court discussed the elements of the offenses, explored the factual basis for the plea, ensured that the petitioner had consulted with his attorney, inquired whether the petitioner was fully satisfied with the representation provided by his attorney, ascertained that the petitioner understood the rights he waived

9

by virtue of his plea, and determined that the petitioner was entering his plea freely and voluntarily.  In addition, the court specifically informed the petitioner of the maximum sentences for the charged offenses.  As the court explained, under a plea of no contest, the petitioner did not expressly admit his guilt, but he nevertheless gave up his right to a trial, and he authorized the court to treat the petitioner as if he had entered a plea of guilty. The petitioner stated that he understood all of the foregoing.

In the Nebraska Court of Appeals' Memorandum Opinion and Judgment of July 18, 2003, on appeal from the denial of the petitioner's first motion for postconviction relief, the court considered, among other issues, the first and second claims raised by the petitioner in his § 2254 petition (ineffective assistance of counsel and involuntary plea).  As to the plea, the Court of Appeals concluded:

> the plea taking proceeding was about as complete, thorough and proper as we can imagine. Thus, Witmer's no contest pleas were freely, voluntarily, knowingly, and intelligently made.  The State's recitation of the factual basis for the crimes charged, after which Witmer pled no contest, was sufficient evidence of his guilt.  (Witmer's appearance at the emergency room 20 minutes after the attempted robbery with three gunshot wounds makes the factual basis rather compelling.)

State v. Witmer, No. A-02-338, slip op. at 15 (Neb. App. July 18, 2003). As further discussed below, the petitioner has failed to establish any constitutional infirmity in connection with his plea.

### Ineffective Assistance of Counsel

As to ineffective assistance of counsel, the Nebraska Court of Appeals correctly identified Strickland v. Washington, 466 U.S. 668 (1984), as the controlling "clearly established Federal law," 28 U.S.C. § 2254(d)(1).  So the question is whether the decision of the Court of Appeals in State v. Witmer, No. A-02-338, slip op. (Neb. App. July 18, 2003), on the merits of the petitioner's ineffective assistance claim was either contrary to or an unreasonable application of Strickland.  Honeycutt v. Roper, 426 F.3d 957, 960 (8th Cir. 2005).

"Ineffective assistance under Strickland is deficient performance by counsel resulting in prejudice."  Rompilla v. Beard,  545 U.S. 374, 380 (2005).  "In order to overturn

a conviction on grounds of ineffective assistance of counsel, the [petitioner] must show that his trial counsel's performance fell below the standard of customary skill and diligence that a reasonably competent attorney would display and that there is a reasonable probability that the outcome would have been different but for the substandard actions of counsel." Rousan v. Roper,  436 F.3d 951, 959 (8th Cir. 2006), *citing* Strickland, 466 U.S. at 694.

Thus, a habeas petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  If counsel's performance was not deficient or if the petitioner suffered no prejudice, the court need not address the other part of the test.  Williams v. Locke, 403 F.3d 1022, 1025 (8th Cir. 2005) ("we need not ask whether [the] lawyer's performance was deficient if we can clearly determine that no prejudice resulted from [the] lawyer's alleged error").

In the petitioner's first postconviction appeal, the Nebraska Court of Appeals addressed whether trial counsel rendered ineffective assistance by permitting the petitioner to plead no contest (a) without moving to suppress the petitioner's statements in the hospital and blood evidence as illegally obtained and (b) without providing Barnes' proffer statement to the petitioner.  The Court of Appeals quoted exchanges during the petitioner's plea colloquy which established that the petitioner knew he was waiving the right to move to suppress his statements made and the evidence obtained by the State prior to the plea, and that the petitioner voluntarily, knowingly, freely and intelligently waived his right to a suppression hearing to contest the State's acquisition of that evidence.

The Court of Appeals also concluded that the petitioner had failed to show why his attorney's advice to accept the plea bargain should be considered deficient representation. Moreover, the petitioner had demonstrated no prejudice because the evidence against him was substantial, such as the gunshot wounds he displayed within the period immediately after the robbery.  See also State v. Barnes, 2001 WL 1262399 at *1 (Neb. App. Oct. 23, 2001) (decision on direct appeal in Kenneth Barnes' criminal case): "[The police soon considered] the robbery and shooting and Witmer's injuries as connected because one of the victims believed he had shot one of the assailants **and Witmer was the only person admitted to any Lincoln hospital with gunshot wounds in the morning hours of**

11

**August 16**[, 1999]."  (Emphasis added.)

Similarly, as to the proffer statement, the Court of Appeals concluded that, even if counsel's failure to provide Barnes' proffer statement to the petitioner could be considered ineffective assistance, the petitioner suffered no prejudice.  The proffer contradicted some of the statements in Barnes' earlier police report, but the proffer did not aid the petitioner "certainly not to the extent of rejecting a favorable plea bargain and proceeding to trial." State v. Witmer, No. A-02-338, slip op. at 21-22 (Neb. App. July 18, 2003).  The Court of Appeals pointed out that but for the petitioner's plea bargain, he would have faced trial on seven felonies with a potential maximum prison sentence of 260 years.  Id., slip. op. at 22. Instead, the petitioner agreed to plead no contest to three charges.  The proffer, although inconsistent on some points with Barnes' earlier police report, still incriminated the petitioner.  Thus, "Barnes' [proffer] in no way provides a 'reasonable probability' that [the petitioner] would decide to face 260 years' imprisonment after trial rather than accepting the plea agreement."   Id.

Applying Strickland to ineffective-assistance claims arising out of the plea process, the element of prejudice "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process.  In other words, in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985).

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial.  For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination **whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea**. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of **the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial**.

12

Id. (Emphasis added.)

Barnes' proffer would not have led a reasonable attorney to recommend that the petitioner risk a trial on seven charges with a maximum prison sentence of 260 years in the circumstances of this case. The proffer did not create any affirmative defenses. Instead, the proffer made it clear that the petitioner was not only present at the scene of the crimes, but that he failed to depart when, giving him the benefit of the doubt, it necessarily became apparent that criminal activity was about to occur or, in fact, was underway.

The proffer revealed that the petitioner had multiple opportunities to disassociate himself from the criminal endeavor and leave, but he chose not to do so, when, for example (assuming the truth of the proffer), Shackelford threatened that if the person he intended to collect money from did not pay ("I'm [Shackelford] gonna make him pay me ...."). Nevertheless, the petitioner joined the men who proceeded up the stairs to the apartments while Barnes parked the car. Subsequently, whether the petitioner entered Carole Gutzmer's apartment or remained in the hall, the petitioner did not withdraw from the criminal activity even after the intruders had broken into Gutzmer's apartment. Then, he not only failed to leave the premises before the crime of illegal entry into the second apartment occurred, but he instead entered the second apartment and turned on the light to the back room, at which point gunfire erupted.

Despite the petitioner's protestations regarding lack of criminal intent, his actual participation in the criminal activity more than sufficed to create a factual basis for conviction as an aider and abettor of the offenses committed by the others, including Shackelford who, according to Barnes' proffer, constituted the principal.[5] As such, the Nebraska Court of Appeals correctly assessed the petitioner's exposure to the full maximum prison sentence of 260 years, and the petitioner wisely accepted the plea bargain recommended by his attorney to avoid that considerable risk.[6]

---

[5]The U.S. Supreme Court has ruled that a person charged with aiding and abetting a crime can lawfully be convicted regardless of the fate (even including acquittal) of the principal. Standefer v. United States, 447 U.S. 10 (1980).

[6]All of the foregoing principles also apply to counsel's representation on direct appeal from the petitioner's conviction and sentence. Counsel did not render ineffective

On the petitioner's claims of ineffective assistance of counsel, I have thoroughly reviewed the record in light of the petitioner's arguments, and I find no support for the view that the state courts arrived at a decision contrary to clearly established Supreme Court law, or that the state courts unreasonably applied Supreme Court decisions to the facts of the petitioner's case,  28 U.S.C. § 2254(d)(1).  Nor has the petitioner shown that the Nebraska courts reached an unreasonable determination of any material fact in light of the record, 28 U.S.C. § 2254(d)(2) and (e)(1).

### Unjust, Untenable and Disproportionate Sentence

The petitioner has repeatedly asserted that his sentence was unfairly disproportionate to those of his co-defendants.  He argues that, based on Barnes' false accusations placing the blame on the petitioner for instigating and carrying out the crimes, the petitioner received a sentence more than double those of his co-defendants.  The petitioner states (filing no. 49 at 25) that Barnes received a prison sentence of 14 to 20 years, and J'Twan Overstreet received a prison term of 10 to 20 years, but the petitioner received consecutive prison terms aggregating imprisonment for 35-50 years.[7]  The police were never able to locate Shackleford.

The U.S. Supreme Court has discussed disproportionality in sentencing, concluding that the Eighth Amendment, which forbids cruel and unusual punishments, contains a "narrow proportionality principle" that "applies to noncapital sentences." Harmelin v. Michigan, 501 U.S. 957, 996-97 (1991) (Kennedy, J., concurring in part and concurring in judgment).  The proportionality principle does not compare sentences among co-defendants but instead considers only whether a sentence is grossly disproportionate to the crime. See, e.g., Lockyer v. Andrade, 538 U.S. 63, 70 (2003), a habeas case in which the Supreme Court recently addressed whether a noncapital sentence should be considered cruel and unusual as grossly disproportionate to the crime.

In Lockyer v. Andrade, a California state court had sentenced the petitioner, Andrade, to prison for two consecutive terms of 25 years to life under California's "three

assistance by failing to raise issues which would not have prevailed on appeal.

[7]Those are the prison sentences before reduction for good-time credit.

14

strikes" law for two incidents of shoplifting videotapes worth an aggregate of approximately $153.  As a result, Andrade would not be eligible for parole until he served 50 years and was 87 years old. Justice O'Connor, speaking for the Court, observed that Supreme Court "precedents in this area have not been a model of clarity." Id. at 72.   However, one "clearly established" principle exists, as expressed in Justice Kennedy's concurring opinion in Harmelin v. Michigan, 501 U.S. at 1001, i.e.:

> All of these principles-the primacy of the legislature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors-inform the final one: **The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are** "**grossly disproportionate**" **to the crime**.

Lockyer v. Andrade, 538 U.S. at 77 (O'Connor, J), *citing* Harmelin v. Michigan, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in judgment). This "gross disproportionality principle" articulated in Justice Kennedy's concurrence in Harmelin and reiterated in the majority opinion in Lockyer is the clearly established Federal law, as determined by the Supreme Court, which governs the petitioner's third § 2254 claim, insofar as the petitioner relies on the disparity between his prison sentence and those that his co-defendants received or the sentence he speculates he might receive upon a new plea or trial.

However, the petitioner has not established that his sentence is grossly disproportionate to the crime, and disparity in sentences among co-defendants is not a constitutional issue.  Thus, the petitioner has not demonstrated any infirmity in the state court decisions refusing to grant the petitioner's third § 2254 claim.  The petitioner erroneously assumes that an exploration of Barnes' proffer at or before sentencing would have made a difference concerning punishment in his case.  Given that the petitioner was on parole when the crimes occurred, that he had an extensive criminal history for a 24-year old man, and that Barnes' proffer did not exonerate him, as previously discussed, the petitioner's preoccupation with the proffer is purely speculative. Indeed, the record suggests that the disparity between the penalties imposed on the petitioner and those received by the other perpetrators resulted from (a) Barnes' deal with the prosecution in

his own case; (b) Overstreet's peripheral role in the crimes and plea to lesser charges, (c) the petitioner's criminal history,[8] and, of course, (d) the failure of law enforcement to find and apprehend Shackleford.

Similarly, in Ewing v. California, 538 U.S. 11 (2003), a companion case to Lockyer, a sentence of 25 years to life for felony grand theft of three golf clubs, pursuant to California's three strikes law, did not violate the Eighth Amendment as disproportionately punitive. The Supreme Court held that particular deference must be accorded to a state's desire to deter repeat offenders.  In Ewing, the "sentence [was] justified by the State's public-safety interest in incapacitating and deterring recidivist felons ...." Id. at 29.

In short, although the Eighth Amendment prohibits punishment "grossly disproportionate" to the severity of the offense, proportionality review of noncapital sentences is highly deferential to state legislative decisions defining crimes and setting sentencing ranges.  In light of those precedents, the petitioner did not sustain federal constitutional injury, a miscarriage of justice, manifest injustice or plain error by virtue of the length of his sentence.

Under Nebraska state law, an "untenable" sentence has a more general meaning than the Eighth Amendment "gross disproportionality principle" addressed by the U.S. Supreme Court in Harmelin, Lockyer and Ewing.  See, e.g., State v. Iromuanya, 719 N.W.2d 263, 292 (Neb. 2006):  "Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion .... An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result."  See also State v. Harrison, 588 N.W.2d 556, 563 (Neb. 1999):  "Thus, so

---

[8]For example, when the judge at the petitioner's sentencing hearing mentioned that no one knew the name of the fourth person involved in the robbery, the petitioner volunteered that he had possession of a paper called a proffer, which he did not receive from his lawyer, and which identified the fourth person by name.  The judge indicated that identification of the fourth person by name would not make any difference in his sentencing decision. From the judge's perspective, the dominant sentencing factor was that the petitioner, having just been released on parole, immediately got involved with armed "friends" who were quite obviously up to no good.  (See BOE of Sentencing hrg on 3/16/00; Ct. Rep'r Cert. 4/24/00, pages 67-71.)

long as the trial court's sentence is within the statutorily prescribed limits; is supported by competent evidence, ... and is not based on irrelevant considerations, see State v. Pattno, ... 579 N.W.2d 503 (1998) (holding trial court abused discretion by relying on personal religious views), an appellate court cannot say that a trial court has abused its discretion. Such a sentence is not untenable, does not unfairly deprive a litigant of a substantial right, and does not deny a just result."

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  See also Taylor v. Bowersox, 329 F.3d 963, 968 (8th Cir. 2003):  "A state's interpretation of its own law is virtually unreviewable by a federal court[,]" cert. denied, 541 U.S. 947 (2004).  Accord Lupien v. Clarke, 403 F.3d 615, 619 (8th Cir. 2005) (determinations of state law made by a state court are binding on a federal court in habeas proceedings). This court will not second guess any decision by the Nebraska courts declining to find as plain error or otherwise, *under Nebraska law*, that the petitioner received an "untenable sentence."

## False Accusations

In Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court held that prosecutors may not permit testimony they know to be false to stand uncorrected, if "'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.'"  Id. at 154, *quoting* Napue v. Illinois, 360 U.S. 264, 271 (1959). In Giglio, the government's principal witness testified falsely on cross-examination that he had received no promise of immunity from prosecution.  The prosecutor failed to correct the perjury and, in fact, repeated the falsehood in closing argument. The Supreme Court reversed the defendant's conviction because of the reasonable likelihood that the prosecutor's knowing use of perjury on an issue relevant to the witness' credibility affected the jury's decision and thus deprived the defendant of due process.  Giglio, 405 U.S. at 154-55.

In Napue v. Illinois, 360 U.S. 264, 271 (1959), a key witness for the prosecution at the defendant's murder trial testified falsely that he had received no promises in exchange for his testimony. However, the prosecutor had promised to recommend a reduced

sentence for the witness. Despite knowing of the witness' perjury, the prosecutor failed to correct it. The Supreme Court reversed the defendant's conviction because the testimony, which the prosecutor knew to be false, was material, i.e., could have affected the outcome of the trial. Id. at 272. Thus, the government may not allow perjured testimony at trial to stand uncorrected if there is a reasonable chance that the testimony could affect the jury's judgment.

On the other hand, "testimony shown to be inconsistent with prior statements is not necessarily perjury ... and not every contradiction is material." United States v. Vallie, 284 F.3d 917, 921 (8th Cir. 2002) (although investigator's grand jury testimony was not completely accurate, it did not amount to perjury nor materially misrepresent the evidence or eyewitness testimony, and thus, it did not prejudice the defendant), citing United States v. Martin, 59 F.3d 767, 770 (8th Cir.1995).

Not all inconsistencies amount to perjury. See, e.g., United States v. Dunnigan, 507 U.S. 87, 94 (1993) (a witness does not commit perjury if inconsistencies in testimony are not intentional but rather the "result of confusion, mistake, or faulty memory"). See also United States v. Stokes, 211 F.3d 1039, 1045 (7th Cir. 2000):

> In determining what constitutes perjury, courts have previously relied upon the definition that has gained general acceptance and common understanding under the criminal perjury statute, 18 U.S.C. § 1621: "A witness testifying under oath or affirmation violates this statute if he or she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."

Accord United States v. Plumley, 207 F.3d 1086, 1095 (8th Cir. 2000).

Also, not all inconsistencies are material. See, e.g., United States v. Burch, 156 F.3d 1315, 1329-31 (D.C. Cir. 1998), cert. denied, 526 U.S. 1011 (1999):

> Even if appellant could establish that the prosecution either sponsored or failed to correct false testimony, he cannot satisfy the materiality test for prosecutorial misconduct articulated in Napue and reiterated in Giglio v. United States, 405 U.S. 150, 154 (1972) and United States v. Agurs, 427 U.S. 97, 112-13 (1976). Before finding an error of constitutional significance, Giglio directs that a reviewing court must determine whether "the false testimony could in any reasonable likelihood have affected the judgment of the jury." Id. at 154 ... (citations omitted).

18

In this case, the petitioner challenges the prosecutor's reliance on Barnes' original police report as the factual basis for the petitioner's plea, without mentioning Barnes' proffer statement.  At the time of the petitioner's plea hearing, Barnes had not yet prepared his subsequent affidavits, which were more exculpatory of the petitioner than the proffer. When Barnes provided his proffer, the contents of the proffer did not differ from Barnes' police report so significantly as to the petitioner to have affected the outcome of a trial.

The omission of Barnes' proffer statement during the petitioner's plea proceedings does not meet the test for prosecutorial use of perjured testimony discussed in <u>Giglio</u> and <u>Napue</u>.  Barnes' proffer did not exonerate the petitioner.  At most, the proffer provided potential impeachment evidence regarding collateral details of the crime, if the petitioner had proceeded to trial.  Disregarding Barnes' affidavits, which came later, the proffer was exceedingly unlikely to affect the outcome of a trial, as it placed the petitioner at the scene of the crime as a full participant in criminal activity and, at a minimum, as an aider and abettor.  In fact, Barnes' proffer indicates that there were several times before and even during the commission of the crimes when the petitioner could have, but chose not to, withdraw from the criminal endeavor.  Thus, the petitioner has not demonstrated that the prosecution knowingly sponsored false testimony or that, absent such alleged false testimony, an acquittal or some other favorable outcome would likely have resulted.

### Brady

The petitioner also argues that the prosecution wrongfully withheld exculpatory evidence by failing to provide Barnes' proffer statement to the petitioner in accordance with the requirements of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The decision in "<u>Brady v. Maryland</u>, 373 U.S. 83, 87 ... (1963), held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  <u>Banks v. Dretke</u>, 540 U.S. 668, 683 n.5 (2004).  "We set out in <u>Strickler v. Greene</u>, 527 U.S. 263, 281-282 ... (1999), the three components or essential elements of a <u>Brady</u> prosecutorial misconduct claim:  'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;  that evidence must have been suppressed by the State, either willfully or inadvertently;  and prejudice must

19

have ensued.' 527 U.S., at 281-282...."   <u>Banks v. Dretke</u>, 540 U.S. at 691.

The petitioner has consistently conceded that Barnes' proffer statement "still incriminated" him. (See, e.g., petitioner's written Oral Argument, admitted as Exhibit 35 in his second postconviction action, at 7, 9.) According to the petitioner, the proffer was material to both punishment and guilt because the proffer demonstrated that Barnes had abandoned his original version of events as set forth in the police report. More important, according to the petitioner, the proffer foreshadowed confessions to come, as later set forth in Barnes' affidavits, which exculpated the petitioner to a greater degree than did Barnes' proffer. (See, e.g., petitioner's brief to the Neb. Supreme Court of Jan. 10, 2005, on further review of Case No. A-04-905, "Argument 2" at 4-6.)

By characterizing Barnes' proffer, which did not exonerate the petitioner, as a herald of future more exculpatory accounts to come, the petitioner attempts to bootstrap the prosecution's alleged failure to disclose Barnes' proffer during or before the petitioner's plea hearing as a violation of <u>Brady</u> or, as previously discussed, of <u>Giglio</u> and <u>Napue</u>. However, the reality is that the proffer did not exculpate the petitioner, and Barnes has simply provided four different narratives, any one of which would have been subject to impeachment by its inconsistency with the others. The petitioner's fourth claim does not warrant habeas corpus relief. Barnes' proffer simply lacks the significance attributed to it by the petitioner.

## Conflict of Interest

In his second postconviction action, as in his § 2254 petition, the petitioner noted that during his hospitalization in August of 1999, and before the appointment of public defender Webb Bancroft as his trial attorney, Bancroft was assigned for 9 to 12 days[9] to represent Barnes. Upon the reassignment of Bancroft to represent the petitioner, Barnes obtained another attorney.

_____

[9]Barnes was arraigned on August 17, 1999, see <u>State v. Barnes</u>, 2001 WL 1262399 at *3 (Neb. App. Oct. 23, 2001), at which point he presumably had counsel. By August 26, 1999 (or August 29 at the latest), his attorney had already withdrawn; see filing no. 39 at 17 (Exh. 13, Lincoln Police Additional Case Information, Investigative Comments of 8/27/99 and 8/30/99). Thus, Bancroft represented Barnes for no longer than the period of August 17 to August 26 or 29, 1999 (9 to 12 days).

"An actual conflict ... is a conflict of interest that adversely affects counsel's performance."   Mickens v. Taylor, 535 U.S. 162, 172 n. 5 (2002). "An attorney's performance must be adversely affected by the conflict of interest before there is a constitutional violation .... If a trial court improperly requires joint representation of co-defendants over timely objection, reversal is automatic.  See Holloway v. Arkansas, 435 U.S. 475, 487-90 ... (1978).  In all other conflict situations, there is no Sixth Amendment violation, and thus no reversal, absent a showing that an actual conflict of interest adversely affected counsel's performance. See Mickens v. Taylor, 535 U.S. 162, 167-74 ... (2002)."   Hunter v. Secretary, Dept. of Corrections, 395 F.3d 1196, 1200 (11th Cir.), cert. denied, 126 S.Ct. 120 (2005).

In this case, no prejudice is presumed, and the petitioner has not shown that the successive representation actually affected the adequacy of his attorney's performance on his behalf.  The petitioner had to show actual prejudice from the successive representation, and he has not done so.

### Evidentiary Hearing

In filing no. 78, the petitioner renews his request for an evidentiary hearing.  It is not clear from filing no. 78, however, what matters the petitioner believes should be heard in such an evidentiary hearing.   On multiple occasions in state and federal court, the petitioner has presented Barnes' proffer statement and affidavits as evidence that Barnes recanted his original accusations against the petitioner.  The respondent does not deny that Barnes made those three subsequent statements.  In fact, the changes in Barnes' versions of events constitute the heart of this habeas corpus case.

It is also clear from the record that Barnes made a deal in his own criminal case. While the exact terms of Barnes' plea bargain are not spelled out in the record of this case, the petitioner has made a record that Barnes did benefit from a plea agreement based, at least to some degree, on his testimony against the petitioner.  (See, e.g., petitioner's written Oral Argument, admitted as Exhibit 35 in his second postconviction action, at 14-15.)  (Exh. 35 to BOE of 3/19/04 hrg in petitioner's 2d postconviction action; Ct. Rep'r Cert. 9/1/04.)  The respondent does not deny those allegations.

"[A] habeas petitioner who has failed to develop the factual basis of a claim in state

21

court proceedings is entitled to an evidentiary hearing under only very limited circumstances.  The petitioner must show that the claim relies on a factual predicate that could not have been discovered through the exercise of due diligence, and that the facts would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found [the petitioner] guilty of the underlying offense.  28 U.S.C. § 2254(e)(2)."  Moore-El v. Luebbers, 446 F.3d 890, 901 (8th Cir. 2006).

As the factual allegations relating to Barnes' plea bargain, lesser sentence than that of the petitioner, and subsequent recanted testimony have all been sufficiently developed to be accepted as true for the purposes of this case, no evidentiary hearing is required as to those matters.  As to other factual matters, if any, on which the petitioner seeks an evidentiary hearing in this court, the petitioner has failed to make the showing required by 28 U.S.C. § 2254(e)(2).  Accordingly, filing no. 78 is denied.

THEREFORE, IT IS ORDERED:

1.     That the Petition for Writ of Habeas Corpus, as amended, filed by Jason N. Witmer is denied and dismissed with prejudice;

2.     That filing no. 78, the petitioner's Motion for an Evidentiary Hearing, is denied; and

3.     That judgment will be entered in accordance with this Memorandum and Order.

December 14, 2006.               BY THE COURT:

                                 s/ *Richard G. Kopf*
                                 United States District Judge

22